1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ARTHUR LEE MILLER,          )          Case No. 08-CV-1675-JLS (JMA)
                            )
              Petitioner,   )          **REPORT AND RECOMMENDATION**
                            )          **OF UNITED STATES MAGISTRATE**
v.                          )          **JUDGE ON PETITION FOR WRIT OF**
                            )          **HABEAS CORPUS**
J.W. SULLIVAN, Warden,      )
                            )
              Respondent.   )
_____)

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Arthur Lee Miller ("Petitioner") is a state prisoner who was convicted on November 18, 2005 of one count of second degree murder (Cal. Penal Code §187(a)) and one count of "attempted voluntary manslaughter, a lesser included offense of the charged attempted murder" (Cal. Penal Code §§ 192(a)/664). [Lodgment No. 3, Court of Appeal Slip Opinion ("Cal. Ct. App. slip. op.") at 1; Lodgment No. 2, Reporter's Appeal Transcript ("RAT") Vol. 8, Nov. 16, Nov. 17, & Nov. 18, 2005 at 727-29.] The jury also found Petitioner "personally used a handgun in the commission of both crimes." (Cal. Penal Code § 12022.5(a)). [Lodgment No. 3, Cal. Ct. App. slip op. at 1.] It found he "personally used a handgun in the commission of the attempted voluntary manslaughter," within the meaning of Cal. Penal Code § 12022.53(b). [*Id.*] Finally, it found he "intentionally discharged a handgun in the commission of the murder which

proximately caused great bodily injury and death," within the meaning of Cal. Penal Code § 12022.53(d)."  [*Id.* at 1-2.]  The trial court sentenced the Petitioner to a term of 55 years, 6 months to life in prison on May 8, 2006.  [Lodgment No. 2, Vol. 9, May 8, 2006 at 754.]

Petitioner appealed his conviction, and on December 21, 2007, the California Court of Appeal, Fourth Appellate District, Division One affirmed the conviction in an unpublished opinion.  [Lodgment No. 3, Cal. Ct. App. slip op. at 1, 28.]  The court amended its opinion on January 10, 2008 and the conviction remained affirmed.  [Lodgment No. 3, Order Modifying Opinion ("Cal. Ct. App. mod. slip op.") at 1-3.]  Petitioner subsequently filed a petition for review in the California Supreme Court [Lodgment No. 3, Petition for Review] on January 28, 2009, which that court summarily denied on April 9, 2008.  [Lodgment No. 4 at 1.] Petitioner did not pursue collateral review in the state courts.

Petitioner filed the instant petition on September 11, 2008.  [Doc. No. 1.]  Respondent filed an answer on April 22, 2009.  [Doc No. 15.]  Petitioner filed a traverse on May 11, 2009. [Doc. No. 16.]

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct.  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992).

The relevant facts of the case are taken directly from the California Court of Appeal opinion:

> In the late afternoon of April 16, 2005, Miller (aka Speed and Speedy), who lived in the Hidden Meadows apartment complex in San Diego County with his girlfriend and their two children, was working on the fuel pump in his Nissan 300ZX parked next to his Nissan Maxima in the apartment complex parking lot with his friend Richard Ashe.  While they worked on the car, three men drove into the parking lot and Miller walked over to talk to them.  As he was talking with them and smoking a cigarette, Miller saw his girlfriend walk to her car in the parking lot and walked over to her, giving her some money.  Because Miller seemed fine at the time, his girlfriend left to run errands, leaving their five-year-old son in their

2

apartment for Miller to watch.

After about five to 10 minutes of resumed talking with the men, Miller walked back to his car in which Ashe was then sitting. Miller who seemed to be different to Ashe as if his mind were somewhere else, suddenly asked Ashe where his gun that he sometimes carried was. When Ashe told him he did not know, they looked in the trunk of the Maxima where they found the gun and Miller picked it up. Miller then crossed the parking lot and fired three shots at one of the apartment buildings in the complex.

Afterwards, Miller walked up the stairs to the second floor of the complex, where Alan Jackson, another resident of the complex, was sitting drinking beer and listening to music on the landing at the top of the stairs with James Edwards, who did not live in the complex, but visited friends and family there regularly. Without any discussion, Miller approached Edwards from behind, pointed the gun about an inch away from the back of his head and fired two shots in his neck. Edwards fell face forward onto the ground and Miller shot him three more times, in the lower back, arm and chest. Edwards died as a result of the multiple gunshot wounds

Miller then walked back down the stairs and fired two more shots at the complex before turning his attention to Ashe, who was still in the parking lot. When Miller pointed the gun at Ashe, he ran away but Miller pursued him. As they ran, Miller tried to shoot Ashe, but the gun would not fire. When Ashe ran up the stairs, he saw Edwards lying in a puddle of blood. As he ran back down the stairs, Ashe could hear the sound of the gun clicking as Miller continued to follow him. When Ashe fell down in the parking lot, Miller again unsuccessfully tried to shoot him.

As Miller was chasing Ashe, another resident of the complex saw what was happening and yelled, "Speedy stop. Don't." Miller continued running out to the street where he removed a glove from his right hand and dropped it in the road. After he dropped the gun in the street, Miller ran into a nearby complex less than a half mile away where he was later found sitting on the ground in the parking lot. Miller was arrested without problems after being positively identified as the shooter.

A deputy then transported Miller to the Lemon Grove sheriff's station for booking and placed paper bags on his hands while he was in a holding cell to preserve any gunshot residue. As the paperwork was being processed, the deputy observed Miller without the bags urinating on his hands and rubbing them on his pants several times. The deputy's belief that Miller had urinated on his hands to try to remove gunshot residue was later confirmed when Miller confessed to a fellow inmate at jail that he had done so for that purpose.

Meanwhile back at the scene of the shooting, other deputies found the gun and glove in the street along with Miller's cellular phone, which was opened and "on." Miller's fingerprints were found on the phone. The gun, a semiautomatic Ruger 9 millimeter, was determined to be bent and defective. Deputies further found a set of five unexpended 9 millimeter rounds and an empty magazine for a Ruger 9 millimeter in the complex. Several unexpended rounds were found across from Miller's apartment. Although gunshot residue was found on Miller's glove, none was found on

his hands.  Deputies found two clear vials of PCP in a search of Miller's apartment.

Miller was subsequently interviewed at 1:30 a.m., the morning after the shooting.  He gave deputies his full name, date of birth, address, age of his sons, girlfriend's name, relationship status, and job information.  After waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, he gave his version of the events the day of the shooting.  Sometime after 2:00 p.m. while waiting for his girlfriend to come home from grocery shopping,  he and Ashe worked on the fuel pump in his car in the parking lot.  As they did so, a couple of men Miller did not know drove in the parking lot in a green Cadillac.  Ashe then yelled, "Hey look out, look out" and Miller heard four or five gunshots and started running.  Miller continued running even though his five-year-old son was playing in the parking lot because he thought he was being chased.  He ran down a hill and into another apartment complex where he hid under a pool table, staying there until the police arrived and arrested him.   He believed he hurt his foot when he jumped over a fence running away from his complex.

Miller told the deputies that he had smoked some "reefer" and a cigarette containing PCP around 12 or 1 p.m. on the day of the shootings, which usually calmed him down.  He also told them he had oil on his hands from working on his car and denied he was carrying a gun the day of the shooting.  Miller claimed he had not carried a gun since he was a child.

When the deputies suggested that Miller might not remember what happened because his memory may have been altered by the PCP, Miller disagreed, saying that could not be the case because he did not have a gun and he would have remembered if he had shot someone.  The interview lasted until 3:40 a.m.

In addition to the above evidence being presented in the prosecution case against Miller at trial for Edwards's murder and the attempted murder of Ashe, the deputies involved in arresting and transporting him to the station all testified that Miller did not exhibit any outward signs of impairment or intoxication and had been responsive to their questions.

One of the residents of the complex testified that Edwards was known for being loud and often using expletives.  Just minutes before Miller shot him, the resident saw Edwards go downstairs to check on his son in an apartment.  Another resident heard Edwards say "[f***] you" right before he walked back up to the second floor landing and was shot.

The day before the shooting, another resident of the complex had seen Miller who he thought was acting paranoid, pull out a black 9 millimeter gun when a car drove into the complex parking lot.  That same resident saw Miller walking around with his hand on his waistband, like he had a gun, on the day of the shooting.

The parties stipulated that Miller's blood tested positive for marijuana at a level of 10.2 nanograms per milliliter and positive for PCP at 32.9 nanograms per milliliter five and a half hours after his arrest.

4

*Defense case*

Miller's defense was that because of his PCP ingestion, he did not have the required mental state necessary to commit murder or attempted murder and was guilty at most of involuntary manslaughter. In support of this defense, he called Dr. Alex Stalcup, physician and medical director of an outpatient drug treatment program, to testify as to the effects of PCP.

Stalcup testified that PCP causes symptoms of disassociation and "derealization" causing a person to lose their sense of person and time as well as altering sensory experiences. He stated that the degree of impairment from PCP use is equal to the impairment obtained from smoking strong marijuana or drinking three or four beers and that it was easy to overdose on PCP. He explained that PCP takes normal integrated brain functions and separates them so there is no relationship between memory, drive, reward and reason, completely distorting a person's consciousness. Stalcup further noted that a significant number of people using PCP can develop an extreme psychotic reaction to the drug, causing them to act abnormally, like a person with schizophrenia, having delusions, hallucinations, and thought disorders. Such a person is unable to reason or remember what they are doing or why they are doing it. The usual PCP high lasts five or six hours and an adverse reaction can last anywhere from a minute up to several days.

Stalcup additionally testified that the Drug Enforcement Administration recognizes PCP as a uniquely dangerous drug that often causes the user to suffer hallucinations, mood distortion, amnesia, and paranoia as well as suffer a loss of coordination, including slurred speech. Some of the more observable effects of PCP usage are a blank stare, rapid and involuntary eye movements, and an exaggerated gait. PCP may also cause acute anxiety and a feeling of impending doom, paranoia, hostility, or psychosis indistinguishable from schizophrenia. Even experienced PCP users can have an adverse reaction to the drug if they take it unwittingly or in a larger dose than they expected.

Stalcup did not interview Miller in this case because PCP users often have memory failure and are very suggestible to facts provided by an interviewer. Nonetheless, Stalcup believed that the amount of PCP in Miller's system after the shooting was a sufficient amount to cause an adverse reaction and opined that Miller's behavior was consistent with an individual experiencing such a reaction to PCP.

On cross-examination, Stalcup conceded that it is impossible to know whether a person has a good trip or a bad trip based on the amount of PCP in their system. He also acknowledged that the hiding or discarding of evidence after doing something wrong was an indication that the person doing so was aware of what they were doing. Additionally, Stalcup agreed that the facts a person chose a deadly weapon to shoot a human being in their vital organs and then made up a story about someone else being responsible for the crime were indications that the person was aware of what he was doing.

Defense counsel's closing argument focused on Miller's irrational behavior after smoking a cigarette with the three men in the complex parking lot, emphasizing that Ashe and several residents of the complex had described Miller as confused, zoned out, and looking wild before the

08cv1675

1   shooting and attempted shooting of the victims with whom he had no
2   disputes.  Counsel challenged the testimony of the deputies concerning
    Miller not appearing to be under the influence as not credible, arguing that
3   the only explanation for the shooting event was that Miller had suffered a
    psychotic episode, was unaware of his actions and was the poster child
4   for an intoxication defense.  Counsel further argued that Miller was
    functionally unconscious and guilty only of involuntary manslaughter.  The
5   jury found otherwise.

6   [Lodgment No. 3, Cal. Ct. App. slip. op. at 2-9.]

7   **III.    PETITIONER'S CLAIMS**

8       The Petition contends:

9       1.  "The trial court violated petitioner's Sixth Amendment right to an impartial jury

10  and his Fourteenth Amendment right to equal protection by denying his *Batson-Wheeler*

11  motion after the prosecutor used peremptory challenges to remove the only black

12  prospective jurors." [Doc. No. 1 at 6[1] (*citing* Exhibit B at 33-49.)]

13      2.  "The trial court erred in failing to instruct *sua sponte* on the defense of

14  unconsciousness as it related to second degree murder under the theory of implied

15  malice and attempted murder." [Doc. No. 1 at 7 (*citing* Exhibit C at 51-63.)]

16      3.  "The trial court violated appellant's Sixth Amendment right to an impartial jury

17  and his Fourteenth Amendment right to equal protection by denying his *Batson-Wheeler*

18  motion after the prosecutor used peremptory challenges to remove the only black

19  prospective jurors." [Doc. No. 1 at 8 (*citing* Exhibit D at 65-88.)]

20      4.  "The trial court erred in failing to instruct *sua sponte* on the defense of

21  unconsciousness as it related to second degree murder under the theory of implied

22  malice and attempted murder." [Doc. No. 1 at 9 (*citing* Exhibit E at 90-103.)]

23      5. "Evidence was insufficient to support the findings of implied malice as there

24  was no showing that appellant was subjectively aware that smoking PCP would trigger a

25  homicidal reaction." [Doc. No. 1 at 13 (*citing* Exhibit F at 105-111.)]

26      The first and third claims are verbatim except the first count uses the word

27  "petitioner's" and the third count uses the word "appellant's."  The Court has also

28  _____

[1] Cited page numbers are those assigned by the Clerk of the Court.

6

reviewed pages 33-49 of Exhibit B and pages 65-88 of Exhibit D and concludes the claims are the same.  Thus, the Court will analyze these claims together. The second and fourth claims are verbatim, and the court concludes pages 51-63 of Exhibit C and pages 90-103 of Exhibit E set forth the same claim.  Thus, the Court will also analyze these claims together.

## IV.   ANALYSIS

### A. Standard of Review

The Court may grant a petition for habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Mere errors of state law are not cognizable in federal habeas corpus proceedings.  *Id.*; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern this petition since it was filed after the statute took effect on April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The Court cannot grant a habeas petition asserting claims that were adjudicated on the merits in state court unless the Court first concludes the state court decision

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2)

The Supreme Court has defined "contrary to" and "unreasonable application of" as follows:

> A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result...A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (internal citations omitted)

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Where as here, the state's highest court summarily denied Petitioner's claims, federal courts review the "last reasoned decision" of the state court, in this case the unpublished opinion of the California Court of Appeal affirming Petitioner's conviction.  *Ylst v. Nunnemaker,* 501 U.S. 797, 806.

**B.  First and Third Claims: Trial Court's denial of the *Batson-Wheeler* motion**

Petitioner claims the trial court infringed his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to equal protection of the laws by denying his *Batson-Wheeler* motion after the prosecutor removed the only two African-American prospective jurors, Ms. AC and Ms. CY[2] via peremptory challenge.

1.    Facts Surrounding the denial of the *Batson-Wheeler* motion

The relevant facts are taken from the Court of Appeal opinion:

> During jury selection, the prosecutor excused 17 prospective jurors, two of whom were Black (Ms. AC and Ms. CY) on peremptory challenges.[3] After the jury, which did not include any Black jurors, was sworn in, Miller made a *Batson-Wheeler* motion arguing the prosecutor had improperly exercised his peremptory challenges to remove the only two Blacks from the entire panel thereby establishing a pattern of racial discrimination. Finding that the two jurors were part of a recognizable group and appeared to be African-American,[4] the trial court asked the prosecutor to explain his reasons for excusing the jurors.

> When the prosecutor responded, "[a]s for [CY], she had an ex-boyfriend who is a drug-user, and I felt that put her in a sympathetic posture for the case" the trial judge stated she was satisfied "because the court does have a recall of [CY's] history [and did] not find it was a racially motivated peremptory challenge."  The prosecutor added that he recalled that CY's boyfriend was either a drug dealer or a user and "there were

---

[2] The Court refers to prospective jurors by their initials to protect their privacy.

[3]   The quoted text contained the following footnote: "The defense excused 15 prospective jurors, passing on its sixteenth  challenge.

[4]   The quoted text contained the following footnote:   "The court noted that those two jurors were "lighter-skinned" African-Americans.

08cv1675

some issues with that."

Turning to AC, the prosecutor explained that he had asked her questions about her church and did not "feel like she was tracking [his] questions on the differences between standing in judgment of people and...the role of sitting as a juror versus...a view fo the situation from a standpoint of a religion or church.  He also had to ask her questions several times.

When Miller's counsel commented his recollection was that AC had been clear that she had no problem putting her religious beliefs aside to determine the case and that it was his impression the prosecutor was just questioning AC on her ability to decide the case in spite of her religious beliefs "as a lesson for the rest of the jury," the prosecutor explained that the problem was not so much in her answers as in "the manner in which she answered.  She didn't speak up a few times, and I did not feel like she was connecting with me."

The court found, that based on the prosecutor's remarks, "there were adequate justifications for his exercise of the peremptory challenges and certainly neutral explanations for each challenge.  The court found that [AC] did, many times hesitate before responding to the prosecutor's questions, and it would have appeared... that she was hesitating, and one does not know why.  I suppose one explanation is hard of hearing, but the other explanation is to try and couch a response. So based upon that, the court is going to deny your *Batson* motion."

[Lodgment No. 3, Cal. Ct. App. slip. op. at 9-11.]

2.     The Court of Appeal's Ruling

The Court of Appeal denied Petitioner's claim stating:

Miller specifically argues that the trial court erroneously found the prosecutor had articulated race-neutral reasons for excusing the two prospective Black jurors because the prosecutor's justifications were not supported in the record and the court did not make a reasoned and sincere attempt to evaluate those reasons.  He also claims that a comparative analysis under *Miller-El v. Dretke* (2005) 545 U.S. 231, 241 (*Miller-El*) will show that the prosecutor's explanations regarding each juror were pretextual.  We conclude the court properly denied the motion upon finding the prosecutor's peremptory challenges of AC and CY were not based on improper racial bias.

With regard to AC, she mentioned during voir dire she knew a corrections officer who went to her church.  When the prosecutor later asked her specifically about whether she would have the courage in spite of her religious beliefs to find Miller guilty if the case were proven against him, AC asked him to repeat the question.  When he then asked whether any of the prospective jurors had any particular religious beliefs that would impact their ability to be fair, no one responded.  He then specifically asked AC to respond saying, "No? You're sort of smiling and looking at me, but you're not answering, What are you thinking?" AC asked the prosecutor to repeat the question for her.  After doing so, AC answered "no" and that God's "judgment is different from...."  When the prosecutor

9

then asked "from ours?," AC responded "Right now, yeah" and said she was comfortable with that role.

The prosecutor justified the removal of AC from the jury panel based on her religious beliefs and in the manner in which she delivered her answers.  The trial judge herself stated she had observed AC hesitating before answering or commenting on the prosecutor's inquiries. *Wheeler* does not preclude a peremptory challenge to a juror on the basis of the juror's relevant personal values "even though those values may be founded in the juror's religious beliefs." (*People v. Martin* (1998) 64 Cal.App.4th 378, 385.) Further as already noted, a nondiscriminatory challenge may be based on "'the prospective jurors'...manner of answering questions.'" (*Reynoso, supra,* 31 Cal. 4th at p. 917.) The prosecutor is not required to present reasons that rise to the level of a challenge for cause, and could have reasonably decided on this record to peremptorily challenge AC whose manner of answering questions made it difficult to determine whether her statements really reflected her beliefs.  Thus, the court could have reasonably concluded on its own observations as well as the prosecutor's statements that a race-neutral reason was offered for the excusal of AC, which precluded an inference of a discriminatory purpose.

The court could likewise reasonably find that there was a race-neutral reason offered by the prosecutor for the removal of CY, who had stated that she had an ex-boyfriend who had used crystal methamphetamine and was in and out of prison for fraud, robbery, and assault.  The prosecutor explained that he had excused CY because her ex-boyfriend used drugs and such might make her unreasonably sympathetic towards Miller.  Generally a prosecutor's belief that a potential juror would be unduly sympathetic to a defendant is a legitimate race-neutral based reason for a peremptory challenge. (*see People v. Dunn* (1995) 40 Cal. App.4th 1039, 1054.)

Additionally, the trial court could consider that the circumstances of the case were not such that they suggested a clear motive for the prosecutor to excuse African-Americans. In *Johnson,* the high court found there was a prima facie case of racial bias because the defendant was Black, the victim was White, and the prosecutor had excluded all three Black persons in the jury venire. (*Johnson, supra* 545 U.S. at pp. 172-73.) Here both the defendant and the victims are Black.  Thus, the factual scenario here is not completely comparable to *Johnson* where the circumstances facially supported an inference of discrimination.

Miller also asserts the pretextual nature of the prosecutor's stated reasons for excusing AC is shown by the fact that the prosecutor did not ask any other jurors questions about their religious beliefs.  We disagree. Although, the failure to question other jurors about the claimed area of concern may be a valid factor to consider, here the record shows the prosecutor asked the entire panel of prospective jurors twice, once during the questioning of AC and later after other prospective jurors replaced ones that had been removed, whether they had any particular religious views that would impact their ability to sit in judgment of another human being or hear this case.  When no other jurors responded, the prosecutor had no reason to further inquire about their religious beliefs and the lack of further questioning does not require an inference of pretext.  (*See Lewis and Oliver, supra,* 39 Cal.4th at p. 1018 & fn. 14.)

10

Nonetheless, the record reveals that after several other jurors later mentioned that they knew various law enforcement or legal officers from their churches, one of whom further noted she did not drink due to her religious beliefs, both were removed as jurors by peremptory challenges (one by the prosecutor and the other for the defense). In addition, the court on its own motion excused a male juror for cause before either counsel could question him when he expressed strong concerns as to whether he could be fair to Miller because of his religious beliefs. These facts additionally lend support to the trial court's finding that the prosecutor's motive to keep strong religious beliefs out of the jury equation was not a pretext for excusing AC.

Contrary to Miller's additional argument that AC's answers to her religious beliefs would not affect her ability to serve as an impartial juror show the prosecutor's reason was pretextual, those purported assurances were not required to be accepted uncritically where as here, her observable actions created ambiguity in her answers. Under these circumstances, it appears the court found the prosecutor's reasons truthful as consistent with its own observations. We defer to the court's credibility assessment and find substantial evidence supports the court's finding that Miller did not make a prima facie showing of discriminatory purpose with regard to AC.

Finally Miller asserts that a comparative analysis under *Miller-El, supra* 545 U.S. 231, with respect to AC and CY and jurors similarly situated but not Black who were left on the jury shows the prosecutor's discriminatory purpose in excluding AC and CY as jurors. Under a comparative analysis review, "'[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.'" (*Lewis and Oliver, supra*, 39 Cal. 4th at p. 1017.) In making this comparative analysis, the proper inquiry is whether the prosecutor "honestly found pertinent and legitimate dissimilarities between members of the group he challenged and members of the group he accepted." (*Huggins, supra*, 38 Cal. 4th at p. 233.)

Here, Miller's counsel did not ask the trial court to do a comparative analysis before ruling on his *Batson-Wheeler* motion. Although our California Supreme Court has assumed, without deciding, that a comparative analysis may be undertaken for the first time on appeal in light of the United States Supreme Court doing so in *Miller-El, supra*, 545 U.S. 231, (see *Lewis and Oliver, supra*, 39 Cal.4th at p. 1017; *Huggins, supra*, 38 Cal. 4th at p. 232), even assuming such is proper, it is not very meaningful in this case.

As already noted above, no other juror left seated was questioned about their religious beliefs in a similar manner as AC and those that did express those beliefs were excused. Because there were no remaining jurors to compare with AC and the court's own observations were involved in assessing the validity of the prosecutor's reasons for excluding her as a juror, a comparative analysis on appeal would serve no fruitful purpose and would essentially be unreliable and inconsistent with the deference we accord to the trial court in this area.

[*Id.* at 14-19.]

Moreover, regarding CY, even if a comparison was made under *Miller-El, supra,* 545 U.S. 231 with Juror No. 11, whom Miller claims is the most similarly situated nonblack seated juror to CY to use to show that the prosecutor excused CY because of her race, such analysis does not prove purposeful discrimination on this record. Although both CY and Juror No. 11 had ex-boyfriends with drug problems caused by crystal methamphetamine and had agreed their boyfriends' behavior was not excused by the drugs, unlike CY, Juror No. 11 had two children, had previously served as a juror in a criminal case that had reached a verdict and had one relative who worked as a deputy sheriff and another who worked as a senior volunteer patrol officer with the police department. In addition, Juror No. 11 had no real awareness at the time of her relationship about the extent of his ex-boyfriend's drug addiction, and he had never done "anything terrible to anybody" while on drugs, whereas CY stayed with her ex-boyfriend even though she knew he had a drug problem and was committing crimes, including assault for which he was arrested and imprisoned. Thus, a side-by-side comparison of CY and Juror No. 11 reveals that there were pertinent and legitimate dissimilarities between the two prospective jurors from which the prosecutor could honestly believe they were really not "similarly situated." (*Miller-El, supra*, 545 U.S. at p. 247; *Huggins, supra*, 38 Cal.4th at p. 233.)

Furthermore, the prosecutor had also peremptorily challenged at least six other jurors who either had a substance abuse problem or knew of a family member or friend who did. The prosecutor's decision to retain Juror No. 11 and other jurors who had relatives or friends with substance abuse problems may well have been motivated by countervailing factors in their background that lessened concerns about their potential bias to either party. Miller simply has not shown how a comparative juror analysis reveals any racially motivated striking of jurors in this case.

[Lodgment No. 3, Cal. Ct. App. mod. slip. op. at 1-2.]

In sum, we conclude the trial court made a sincere and reasonable effort to evaluate whether the peremptory challenges were exercised for race-neutral reasons[5] and there is substantial evidence to support the trial court's finding of no discriminatory purpose. Accordingly, Miller's contention based on the denial of his *Batson/Wheeler* motion fails.

[Lodgment No. 3, Cal. Ct. App. slip. op. at 19.]

3.    Standard of Review for a *Batson-Wheeler* claim

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), the Ninth Circuit held that

challenges to factual findings which are based entirely on the state court record are

governed by 28 U.S.C. § 2254(d)(2)'s unreasonableness standard, that is, a federal

---

[5] The quoted text contained the following footnote: "We find Miller's appellate counsel's snide remarks that the trial judge's ruling was "covering" for a biased prosecutor offensive and not supported by the record."

court may only overturn such findings if they are "objectively unreasonable." *Id.* at 999-1000.  In contrast, challenges to a state court's factual findings which are based on evidence presented to a federal court for the first time are governed by 28 U.S.C. § 2254(e)(1)'s requirement that a petitioner must rebut those findings by "clear and convincing evidence."  *See* 28 U.S.C. § 2254 (e)(1); *Taylor,* 366 F.3d at 1000.  In the Ninth Circuit, courts have reviewed state court findings that a prosecutor did not engage in purposeful discrimination under 28 U.S.C. § 2254(d)(2).  S*ee Ali v. Hickman*, 584 F.3d 1174, 1180-81 (9th Cir. 2009), *citing Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006).  The United States Supreme Court, however, has not decided which provision applies to situations, such as this one, where a petitioner challenges the facts upon which a state court decision rests and all the operable facts were before the state court.  *See Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (declining to decide which section applies to a state court's credibility finding in a *Batson* challenge).  The Court in *Collins* did, however, state unequivocally that "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supercede the trial court's credibility determination."  Rather, the state court's credibility determination must be unreasonable.  *Id.* at 339.

This Court is bound by Ninth Circuit authority.  Accordingly, because Petitioner's *Batson* claim and this Court's decision is based entirely on the state court record, the Court will employ § (d)(2)'s standard in its review of Petitioner's claim, i.e., whether the state court's factual findings were objectively unreasonable in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 999-1001, *Hickman*, 584 F.3d at 1180-81.

### 4.   Clearly Established Federal Law

The Constitution's Equal Protection Clause does not allow a prosecutor to peremptorily strike a prospective juror on the basis of race.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  *Batson* constitutes a clearly established precedent. *See, e.g., Ali*, 584 F.3d at 1171 (conditional writ of habeas corpus granted for *Batson* violation).  The

Supreme Court has articulated a three-step process for a trial court to determine

whether the use of peremptory challenges infringed *Batson*:

> "First, a defendant must make a prima facie showing that a peremptory
> challenge has been exercised on the basis of race[; s]econd, if that
> showing has been made, the prosecution must offer a race-neutral basis
> for striking the juror in question[; and t]hird, in light of the parties'
> submissions, the trial court must determine whether the defendant has
> shown purposeful discrimination."

*Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008) (internal quotation marks omitted);

*Batson*, 476 U.S. at 96-98

In "step one" to make a prima facia showing under *Batson*, the defendant must

show:

> (1) the prospective juror is a member of a cognizable racial group, (2) the
> prosecutor used a peremptory strike to remove the juror, and (3) the
> totality of the circumstances raises an inference that the strike was
> motivated by race."

 *U.S. v. Collins*, 551 F.3d, 914, 919 (9th Cir. 2009) (*citing Boyd v. Newland*, 467 F.3d

1139, 1143 (9th Cir. 2006) (internal quotation marks omitted), cert. denied, – U.S. –,

127 S. Ct. 2249 (2007))

If a defendant does not establish a prima facia case, the defendant's challenge

fails and the prosecution is not required to provide a "race-neutral" explanation for the

strike.  *Id.*  In this case, the Court of Appeal did not consider whether step one of a

*Batson* claim was satisfied before evaluating the reasons the prosecutor gave for the

peremptory challenges.  [*See* Lodgment No. 3, Cal. Ct. App. slip. op. at 14-15.]

However, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory

challenges and the trial court has ruled on the ultimate question of intentional

discrimination, the preliminary issue of whether the defendant had made a prima facia

showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality

opinion of Kennedy, J.)  Such is the case here because the prosecutor offered

explanations for the challenges, and the trial court determined intentional discrimination

did not occur.  [Lodgment No. 2, RAT Vol. 1, Nov. 7 & Nov. 8, 2005 at 236-38.]  Thus,

08cv1675

1   this Court's review must focus on steps 2 and 3 of the *Batson* inquiry.

2       The Supreme Court has fleshed out step two of the *Batson* inquiry as follows:

3       A neutral explanation in the context of our analysis here means an
        explanation based on something other than the race of the juror.  At this
4       step of the inquiry, the issue is the facial validity of the prosecutor's
        explanation.  Unless a discriminatory intent is inherent in the prosecutor's
5       explanation, the reason offered will be deemed race neutral.

6   *Hernandez*, 500 U.S. at 360

7       The prosecutor justified the removal of Ms. AC based on concerns about her

8   religious beliefs affecting her ability to judge and her manner in answering questions.

9   [Lodgment No. 2, RAT Vol. 1, Nov. 7 & Nov. 8, 2005 at 237].  Concern about religious

10  beliefs affecting a juror's ability to judge is a race-neutral explanation.  *U.S. v. Stafford*,

11  136 F.3d 1109, 1114 (7th Cir. 1998).  Hesitation in answering questions is "plainly race-

12  neutral."  *Boyde v. Brown*, 404 F.3d 1159, 1170 (9th Cir. 2005).  However, to satisfy

13  *Batson's* second step, the prosecutor's reason must also relate to the case.  *Kesser v.*

14  *Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (*quoting Batson*, 476 U.S. at 96.)

15  A juror's role is to judge the defendant.  Concern regarding an individual's ability to

16  judge, and hesitation in giving forthcoming responses, clearly relates to a prospective

17  juror's ability to serve on the case.

18      The prosecutor explained that Ms. CY was removed because her ex-boyfriend

19  used drugs and, therefore, she might be unreasonably sympathetic towards the

20  defendant. [Lodgment No. 2, RAT Vol. 1, Nov. 7 & Nov. 8, 2005 at 236].  Concern about

21  the sympathy of a prospective juror towards the defendant is a race-neutral factor.  *See*

22  *e.g., Kesser*, 465 F.3d at 369-70 (en banc) (court performed comparative analysis

23  regarding sympathy and whether the prosecutor asked questions regarding sympathy.)

24  Since Petitioner's PCP use was one of the major issues in the case, concern about a

25  prospective juror having sympathy for him because she used to date a drug user relates

26  to the case.  Thus, as articulated by the Court of Appeal, the reasons put forth for the

27  strike of both prospective jurors were racially neutral.  [Lodgment No. 3, Cal. Ct. App.

28  slip. op. at 15-16, *citing People v. Martin*, 64 Cal. App. 4th 378, 385 (1998), *People v.*

1   *Reynoso*, 31 Cal.4th 903, 917 (2003), and *People v. Dunn*, 40 Cal.App.4th 1039, 1054

2   (1995)].

3          Having put forth race neutral reasons for his strikes, the trial court was required

4   to proceed to the third step of the *Batson* inquiry and determine "whether the opponent

5   of the strike has proved purposeful racial discrimination."  *Johnson*, 545 U.S. at 168

6   (*citing Purkett*, 514 U.S. at 767).  At this stage, the judge is required to "assess the

7   plausibility of that reason in light of all evidence with a bearing on it."  *Miller-El v. Dretke*,

8   545 U.S. 231, 252 (2005).  The trial judge must determine whether the reasons

9   advanced by the prosecutor are "pretextual" and the judge's conclusion "'largely will turn

10  on evaluation of credibility.'"  *Hernandez*, 500 U.S. at 365 (*quoting Batson*, 476 U.S. at

11  98)).  As the *Hernandez* court noted, "[i]n the typical peremptory challenge inquiry, the

12  decisive question will be whether counsel's race-neutral explanation for a peremptory

13  challenge should be believed."  *Id.*  The Court may consider any "relevant

14  circumstances" which bear on the issue of whether the prosecutor used the peremptory

15  challenges with racial intent.  It is this final step of the *Batson* inquiry that the Court turns

16  to next.

17         In the Ninth Circuit, violations have been found in the final step of the *Batson*

18  analysis in cases where the record either did not support or flatly contradicted the

19  prosecutor's stated reasons for the strike.  In *McClain v. Prunty*, 217 F.3d 1209 (9th Cir.

20  2000), the prosecutor stated she struck the first African-American juror, SR, because

21  she "mistrusted the system" and "believed that she had been treated unfairly" by it.  *Id.*

22  at 1211. The prosecutor also believed SR had lied when she said she was a stewardess

23  because she was a heavyset woman.  *Id.* The prosecutor's third reason for striking SR

24  was that she lacked any group decision-making experience.  *Id.* The prosecutor stated

25  she struck the second and only remaining African-American juror, JH, because he was

26  a drug rehabilitation counselor and would therefore "root for the underdog." In addition,

27  he "didn't speak in ordinary language" and gave "highly intellectual answers" which she

28  believed would make it difficult for him to get along with other jurors.  *Id.*

1    Upon review of the voir dire, the Ninth Circuit concluded that the reasons given

2   by the prosecutor for the strikes were contradicted by the jurors' own answers.  SR

3   never stated she distrusted the system and gave her occupation as a maintenance

4   worker at U.S. Airlines, not a stewardess.  *Id.* at 1214-15, 1221-22.  In addition, after

5   conducting a comparative analysis with another white juror who, like SR, also did not

6   have decision-making experience but who was not struck, the court found the third

7   reason put forth by the prosecutor for SR's strike was pretextual.  *Id.* at 1211-22.  The

8   court also concluded the reasons given by the prosecutor for JH's strike were

9   pretextual.  *Id.* at 1222- 23.  JH worked as a drug research pharmacist at the Veteran's

10   Administration, not a drug rehabilitation counselor.  *Id.*  The transcript of the voir dire

11   also contradicted the prosecutor's assertion that JH did not speak in "ordinary language"

12   or gave "highly intellectual answers."  *Id.*  The Ninth Circuit concluded that the state

13   court's denial of the *Batson* claim was based on an unreasonable determination of the

14   facts in light of the evidence presented to the trial court.  *Id.* at 1223.

15    The Ninth Circuit came to the same conclusion in *Kesser*, 465 F.3d 351 and,

16   more recently, *Green v. Lamarque*, 532 F.3d 1028 (9th Cir. 2008), *as amended*.   In

17   *Kesser*, the court concluded that the reasons the prosecutor gave for his strike of a

18   Native American woman from the jury venire were pretextual based on a comparative

19   analysis with other jurors and because they conflicted with the juror's own statements

20   on voir dire.  In particular, the court noted that although the prosecutor gave as reasons

21   for the strike that she was "pretentious" and "self-important" because she believed she

22   was the only one who could complete certain paperwork for her job, "he did not ask her

23   further questions about her work or her interpersonal experiences."  *Kesser*, 465 F.3d at

24   354, 364.  Quoting *Miller-El*, the court stated that "'unless he had an ulterior reason for

25   keeping [the juror] off the jury we think he would have proceeded differently . . . . [W]e

26   expect the prosecutor would have cleared up any misunderstanding by asking further

27   questions before getting to the point of exercising a strike.'"  *Id.* at 364 (*quoting Miller-El*,

28   545 U.S. at 244).

In *Green*, the prosecutor struck an African-American juror, Deborah P., because "she had visited her stepfather in prison" and would therefore "likely assume imprisonment would be the outcome of [the] case," she "failed to complete two questions on the juror questionnaire" and "she had held five jobs, suggesting she must have 'problems getting along with others [and] responding to authority.'" *Green*, 532 F.3d at 1031.  The court concluded that the first two reasons set forth by the prosecutor were shown to be pretextual when compared with other white jurors who were not struck.  *Id.* at 1032-33.  As to the third reason, Deborah P.'s five jobs, the court stated that the validity of the reason "was undermined by the fact that he did not ask her a single question about why she changed jobs."  *Id.* at 1033.  The court again quoted *Miller-El*, stating that "'[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'"  *Green*, 532 F.3d at 1033 (*quoting Miller-El*, 545 U.S. at 246).

In *Ali*, the prosecutor struck the only two African-American members.  *Ali*, 584 F.3d at 1176.  The Ninth Circuit determined the prosecutor acted with discriminatory intent when he struck one of the jurors, identified as M.C., because the stated reasons for striking her were not supported by the record.  *Id.* at 1193.  The prosecutor indicated he struck M.C. because her judgment and objectivity might have been adversely affected by the fact her daughter had been the victim of an attempted molestation by M.C.'s stepson, she had past involvement with the criminal justice system, she indicated that anything less than professional and respectful conduct on the part of the lawyers might affect her view of the case, and because she commented that she might have trouble sitting in judgment of others due to her Christian faith.  *Id.* at 1177-78.  On review, the court found the stated reasons were inconsistent with M.C.'s remarks and that a logical conclusion could not be drawn from her comments that she might be biased against the prosecution.  *Id.* at 1184-93.  The court further concluded a comparative analysis of other non-African-American jurors revealed that "two (or three)"

of the stated reasons were pretextual.  *Id.* at 1192.  (*citing Snyder v. Louisiana*, 522

U.S. 472 (2008) for the proposition that "'the prosecution's proffer of [one] pretextual

explanation naturally gives rise to an inference of discriminatory intent,' even where

other, potentially valid explanations are offered.")

      With these authorities in mind, the Court reviews the reasons the prosecutor

provided for removing Ms. AC and Ms. CY.

**Ms. CY**

      Petitioner contends a comparative analysis of Ms. CY to other jurors, most

importantly, Juror No. 11, the juror with whom Petitioner claims Ms. CY is most similarly

situated, reveals that the prosecutor's stated reasons for striking Ms. CY were

pretextual.  [Doc No. 1, Ex. B & D.]  A comparative analysis of Ms. CY and Juror No. 11

was undertaken by the Court of Appeal. [Lodgment No. 3, Cal. Ct. App. slip. op.][6]   As

the Court of Appeal observed, both Ms. CY and Juror No. 11 had ex-boyfriends with

drug problems caused by crystal methamphetamine.  [*Id.* at p. 1.]  Both indicated their

boyfriends' behavior was not excused by their drug use.  [ *Id.*]  On these two accounts

the women appear to be similarly situated.  The Court of Appeal, however, identified

differences between the two.  The Court observed that "Juror No. 11 had no real

awareness at the time of her relationship about the extent of her ex-boyfriend's drug

addiction, and he had never 'done anything terrible to anybody' while on drugs, whereas

[Ms.] CY stayed with her ex-boyfriend even though she knew he had a drug problem

and was committing crimes, including assault, for which he was arrested and

imprisoned."[7] [*Id.* at p. 2.]

      The trial court record is such that it is impossible to determine whether the factual

---

    [6]   During voir dire, Juror No. 11 is initially referred to as Juror No. 14.  The first reference to Juror No. 11 occurs on page 184 of the voir dire transcript where she is referred to as "Juror No. 14." [Lodgment No. 2, RAT Vol. 1, Nov. 7 & Nov. 8, 2005.]

    [7]   The Court of Appeal also noted that "Juror No. 11 had two children, had previously served as a juror in a criminal case that had reached a verdict and had one relative who worked as a deputy sheriff and another who worked as a senior volunteer patrol officer with the police department," whereas CY did not.  *Id.* at p. 2

1   differences identified by the Court of Appeal were in fact considered by the trial court.

2   As discussed above, the prosecutor stated that Ms. CY was removed because she had

3   an ex-boyfriend that was a drug-user or dealer and "there were some issues with that."

4   [Lodgment No. 3, Cal. Ct. App. slip. op. at 10.]  He felt her experience "put her in a

5   sympathetic posture for the case."  [*Id.*]  The trial court, which was not asked to

6   undertake a comparative analysis, found in favor of the prosecution stating she was

7   "satisfied, because the court does have a recall of [Ms. CY's] history [and did] not find

8   that that was a racially motivated peremptory challenge." [*Id.*]

9          A trial court's failure to fully articulate its basis for ruling in favor of the

10   prosecution on a *Batson-Wheeler* challenge is not an independent basis for habeas

11   relief.  "[A] federal habeas court can only grant [the] petition if it was unreasonable to

12   credit the prosecutor's race-neutral explanations for the Batson challenge."  *Rice v.*

13   *Collins*, 546 U.S. 333, 338 (2006).  "[A] state court's finding of the absence of

14   discriminatory intent is 'a pure issue of fact' accorded significant deference," which "is

15   necessary because a reviewing court, which analyzes only the transcripts from voir dire,

16   is not as well positioned as the trial court is to make credibility determinations."  *Miller-El*

17   *v. Cockrell*, 537 U.S. 322, 339 (2003).  "[A] decision adjudicated on the merits in a state

18   court and based on a factual determination will not be overturned on factual grounds

19   unless objectively unreasonable in light of the evidence presented in the state-court

20   proceeding."  *Id.* at 340.  The cold record here cannot adequately convey the

21   circumstances which were present in the courtroom which gave rise to the trial judge's

22   finding that the prosecutor's motive in challenging Ms. CY's was genuinely race-neutral,

23   as this Court "is not as well positioned as the trial court is to make" that determination.

24   *Id.* at 339; *see also Thaler v. Haynes*, – S.Ct. –, 2010 WL 596511 (Feb. 22, 2010)

25   (reversed grant of writ of habeas corpus and remanded for application of AEDPA

26   deference to the state court's factual findings regarding a demeanor-based explanation

27   for a peremptory challenge.)  As the Supreme Court noted in *Hernandez*:

28          Deference to trial court findings on the issue of discriminatory intent
           makes particular sense in this context because, as we noted in *Batson*,

1
2
3
4
5
6

the finding "largely will turn on evaluation of credibility."  476 U.S. at 98, n.
21.  In the typical peremptory challenge inquiry, the decisive question will
be whether counsel's race-neutral explanation for a peremptory challenge
should be believed.  There will seldom be much evidence bearing on that
issue, and the best evidence often will be the demeanor of the attorney
who exercises the challenge.  As with the state of mind of a juror,
evaluation of the prosecutor's state of mind based on demeanor and
credibility lies "peculiarly within a trial judge's province." *Wainwright v. Witt*,
469 U.S. 412, 428 (1985), *citing Patton v. Yount*, 467 U.S.1025, 1038
(1984).

7   *Hernandez*, 500 U.S. at 365 (emphasis added).

8          The present case is one where the genuineness of the prosecutor's motive with

9   respect to Ms. CY "lies peculiarly within a trial judge's province," and the "best evidence

10  [is] the demeanor of the [prosecutor]." *Id.*  Perhaps when the trial court stated she

11  recalled Ms. CY's testimony she was referring to the differences noted by the Court of

12  Appeal or perhaps she was referring to other differences that are not readily identifiable

13  from the cold record.  Regardless of what the unspoken reasons were, deference is

14  owed to the trial court, which was in the best position to evaluate Ms. CY's state of mind

15  and the prosecutor's demeanor.  Furthermore, Ninth Circuit precedent does not support

16  a finding that the prosecutor's proffered reasons were pretextual.  The *Green, Kesser,*

17  *McClain* and *Ali* cases are distinguishable from Petitioner's case because they either

18  involved instances where the prosecutor offered reasons which did not exist, see

19  *Kesser*, 465 F.3d at 363-65; *McClain*, 217 F.2d at 1221-22, involved overtly race-based

20  reasons, see *Kesser*, 465 F.3d at 362, involved internally or logically inconsistent

21  reasons, *Id.* at 367; *Ali*, 584 F.3d at 1184-93, or involved situations where comparative

22  analysis demonstrated obvious pretext; *see Green*, 532 F.3d at 1031-33; *Kesser*, 465

23  F.3d at 362-71; *McClain*, 217 F.3d at 1221-23; *Ali*, 584 F.3d at 1192.  None of these

24  factors exists here and the comparative analysis conducted by the Court of Appeal and

25  the differences it identified between Ms. CY and Juror No. 11 establish that it was not

26  objectively unreasonable for the trial court to credit the prosecutor's explanation for

27  removing Ms. CY in light of the evidence presented.

28  / /

08cv1675

**Ms. AC**

The Court of Appeal concluded that the stated reasons for Ms. AC's removal, based on religion and the manner in which she delivered answers, were not pretextual. If a review of the record undermines the prosecutor's stated reasons, the reasons may be deemed a pretext for racial discrimination. *Kesser*, 465 F.3d. at 360. The prosecutor said he did not believe Ms. AC was tracking his questions regarding the differences in judging people as a juror with judging people as the member of a church. [Lodgment No. 2, RAT Nov. 7 & Nov. 8, 2005 at 237.] He also said, "I know I had to ask her to answer up a few times." [*Id.*] The record indicates Ms. AC twice asked the prosecutor to repeat his question regarding judgment and religion. [*Id.* at 82, 83.] Moreover, the trial judge herself said Ms. AC "did, many times, hesitate[.]" [*Id.* at 238.] The Court of Appeal deferred to the trial judge's determination regarding credibility when concluding Petitioner did not satisfy *Batson's* third step. [Lodgment No. 3, Cal. Ct. App. slip. op. at 17.] Determining the credibility and demeanor of a juror or prosecutor lies "peculiarly within a trial judge's province." *Snyder*, 128 S. Ct at 1208 (*quoting Hernandez*, 500 U.S. at 365 (*quoting Wainwright v. Witt*, 469 U.S. 412, 428 (1985)) (internal quotation marks omitted). Thus, the Court concludes the Court of Appeal did not make an unreasonable factual determination regarding the peremptory challenge of Ms. AC.

Based on the foregoing analysis, the Court finds habeas relief is not appropriate on Petitioner's *Batson-Wheeler* claims.

**C.     Second and Fourth Claims: Lack of a *sua sponte* unconsciousness instruction**

Petitioner's second and fourth claims are that the trial court erred by not instructing the jury *sua sponte* regarding the unconsciousness defense "as it related to second degree murder under the theory of implied malice and attempted murder." [Doc. No. 1 at 7 (*citing* Exhibit C at 51-63); Doc No. 1 at 9 (*citing* Exhibit E at 90-103)].

08cv1675

Petitioner claims the trial court's failure to instruct the jury under CALJIC No. 4.30[8] that unconsciousness based on mental illness was a complete defense to the charges violated his rights to due process under the Fourteenth Amendment and to trial by jury under the Sixth Amendment, *citing Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

    1.   <u>Court of Appeal's Ruling</u>

In rejecting this claim, the Court of Appeal reasoned :

> Here, although the jury instruction discussion was not reported, Miller's counsel stated on the record he was satisfied with the proposed instructions, which included CALJIC Nos. 4.21.1 and 4.22, defining voluntary intoxication for the jury and informing them that such condition could be considered on the question of Miller's mental state for the specific intent crimes charged, including the lesser offenses to those crimes. Further, consistent with Miller's defense at trial, the court instructed under CALJIC No. 8.47, which provides in part that if the jury found "that a defendant while unconscious as a result of voluntary intoxication, killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter."

> Now, relying on his expert's testimony about the effects of PCP and his opinion that the amount of PCP in Miller's system five hours after his arrest could trigger a psychotic episode causing delusions and hallucinations, his pretrial statements that he did not remember having a gun and shooting anyone as well as the testimony of people at the complex who described Miller as "wild in the eyes" and acting differently than usual at the time of the shooting, Miller claims that the court was also required to instruct on unconsciousness as a complete defense based on the inference he had suffered an involuntary psychotic event stemming from his voluntary ingestion of PCP.

> Miller's unconsciousness claim is based on pure speculation, which does not give rise to a duty to instruct the jury. *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823.)  Rather Miller's own admissions in his pretrial interview and in his appellate briefing make clear that he was voluntarily intoxicated at the time of the shootings and did not lack awareness of his actions during the course of the offenses.  At no time during his interview did he claim to be unconscious, only claiming he could not recall having a

---

[8] CALJIC 4.30 reads "A person who while unconscious commits what would otherwise be a criminal act, is not guilty of a crime.  This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor or any similar cause.  Unconsciousness does not require that a person be incapable of movement.  Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged crime for which [he] is here on trial.  If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time the alleged crime was committed, [he] must be found not guilty." [Lodgment No. 3, Cal. Ct. App. slip. op. at 19-20 (brackets omitted).]

gun or shooting it.  However, the purposeful nature of his conduct, intentionally smoking a cigarette laced with PCP, putting on a glove before the shootings, obtaining a loaded gun from the trunk of his car, aiming the gun at his victims, shooting one victim in vital areas of the body, discarding the gun and glove before leaving the scene, hiding from the police, urinating on his hands to erase any traces of gunshot residue, and making up a story about someone else shooting the murdered victim suggest Miller was conscious and aware of his actions.

    In addition, Miller's expert who had not interviewed Miller, and thus did not testify as to mental state during the shooting or say he was conscious during that time, agreed that the above facts tended to show consciousness.  The expert also testified that a person suffering from a PCP induced psychotic episode was insensitive to pain, whereas Miller complained to police that his foot hurt from injuring it while running away after the shooting.  None of the other witnesses at trial testified that Miller was unconscious or close to unconsciousness near the time of the crimes. His girlfriend said he seemed fine when he was talking with the men in the parking lot shortly before the shooting and deputies who arrested Miller and interviewed him after the shooting did not observe him to be under the influence of any drugs.

    Because a defendant's professed inability to remember an incident without more, is insufficient to warrant an unconsciousness instruction (*People v. Froom* (1989) 108 Cal. App.3d 820, 829-30; *People v. Heffington* (1973) 32 Cal. App.3d 1, 10), Miller's claims of not recalling portions of the events in his pretrial interview, standing alone, were insufficient to trigger the trial court's duty to *sua sponte* instruct on the defense of unconsciousness.  Miller's reliance on *People v. Mosher* (1969) 1 Cal. 3d 379, *People v. Moore* (1970) 5 Cal. App.3d 486, 492 and *People v. Lisnow* (1978) 88 Cal. App. 3d Supp. 21, to show otherwise is unfounded.  In each of those cases the defense expert examined the defendant and made personal observations consistent with the defendant's claimed memory loss or mental derangement before committing a crime.  As noted above, Miller's expert had not examined, tested or evaluated Miller before testifying at trial about the general effects of PCP on chronic users which could vary from person to person. Although the expert testified that some of Miller's behaviors the day of the shooting were consistent with someone suffering a psychotic episode, he also conceded that many of Miller's behaviors were inconsistent with a person suffering such an episode.  The expert's testimony provided the only evidence from which Miller speculates he was suffering from a psychotic episode.

    On this record we can find no substantial competent evidence that would support an instruction on unconsciousness based on an involuntary psychotic episode.  Although Miller was clearly voluntarily under the influence of PCP, there is simply no evidence that he was unconscious as a result of a "bad trip" or drug induced psychosis as he now claims.  We therefore conclude the trial court had no *sua sponte* duty to instruct on unconsciousness as a complete defense in this case or to specifically relate such defense to second degree murder under the theory of implied malice and attempted murder as claimed by Miller.

    Moreover, even assuming the court should have instructed the jury on unconsciousness, any error was clearly harmless beyond a reasonable

doubt in light of this record.  (*People v. Flood* (1998) 18 Cal.4th 470, 499.)
As noted above, the jury was instructed under CALJIC No 8.47 on
involuntary manslaughter due to unconsciousness caused by voluntary
intoxication as well as being fully and correctly instructed on murder and
its degrees, the various forms of manslaughter, the effect of voluntary drug
induced intoxication on the various mental states and intents for the
charged crimes and lesser offenses.  Because the jury found Miller guilty
of attempted voluntary manslaughter, it necessarily found he had the
"specific intent to kill" and rejected the possibility that we was unconscious
due to drugs.  By finding Miller guilty of second degree murder, the jury
also necessarily found the killing resulted from an intentional act
performed by Miller "with knowledge of the danger to and with conscious
disregard for," human life again rejecting the possibility that he was
unconscious due to drugs when he committed the crime.  Accordingly, no
prejudicial jury instruction error can be shown on this record.

[Lodgment No. 3, Cal. Ct. App. slip. op. at 21-25.]

2.    Clearly Established Federal Law

Under the Due Process Clause, "a defendant is entitled to an instruction as to

any recognized defense for which there exists evidence sufficient for a reasonable jury

to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988) (*citing Stevenson*

*v. United States*, 162 U.S. 313 (1896)); *see also Bradley v. Duncan*, 315 F.3d 1091,

1098 (9th Cir. 2002).  In order to obtain habeas relief on a claim that a trial judge erred

by omitting an instruction the petitioner must show the omission so infected the entire

trial that the resulting conviction violated due process.  See *Estelle*, 502 U.S. at 72;

*Henderson v. Kibbe*, 431 U.S. 145, 154; *Cupp v. Naughten*, 414 U.S. 146, 147.  In

determining whether a trial court's failure to instruct violated due process, a reviewing

court must assess whether the error was harmless or had a "substantial and injurious

effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson,* 507 U.S.

619, 637 (1993); *Neder v. United States*, 527 U.S. 1, 8-9 (1999).  A "substantial and

injurious effect" means a "reasonable probability" that the jury would have arrived at a

different verdict had the instruction been given.  *Clark v. Brown*, 450 F.3d 898, 916 (9th

Cir. 2006). The court should consider: (1) the weight of evidence that contradicts the

defense; and (2) whether the defense could have completely absolved the defendant of

the charge.  *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009), *citing Beardslee v.*

*Woodford*, 358 F.3d 560, 578 (9th Cir. 2002).

1    Here, a finding of unconsciousness under CALJIC 4.30 would have absolved

2 Petitioner of the charges.  However, as the Court of Appeal found, there was insufficient

3 evidence to support this defense.  Petitioner's own expert testified that concocting a

4 story blaming someone else after shooting at a person's vital organs, fleeing the scene,

5 and disposing of evidence were indicators that he was aware of his actions.  [Lodgment

6 No. 2, RAT Vol. 7, Nov. 8, 2005 at 578-80.]   For the jury to accept the unconsciousness

7 claim, it would have had to conclude that someone who fatally shot a person in the vital

8 organs, fled the scene after trying to dispose of the gun and a glove he was wearing, hid

9 from the police, and concocted a story blaming someone else was unconscious.

10 [Lodgment No. 2, RAT Vol. 2, Nov. 8, 2005 at 90-91, 100-01; RAT Vol. 3, Nov. 9, 2005

11 at 258, 262; RAT Vol. 4, Nov. 10, 2005 at 359-63, 388, 390, 404; RAT Vol. 6, Nov. 14,

12 2005 at 477-78.]

13    Moreover, even if the evidence supported the conclusion the trial court erred by

14 omitting the instruction, the omission did not affect the entire trial process so as to make

15 it fundamentally unfair.  The significance of the omitted instruction should be evaluated

16 by comparing it to the instructions that were given.  *Estelle*, 502 U.S. at 72; *Henderson*,

17 431 U.S. at 156.  As the Court of Appeal correctly noted, the jury was instructed with

18 CALJIC No. 8.47 to the effect that "if you find that a defendant, while unconscious as a

19 result of voluntary intoxication, killed another human being without an intent to kill and

20 without malice aforethought, the crime is involuntary manslaughter."  [Lodgment No. 2,

21 RAT Vol. 8, Nov. 16, Nov. 17, & Nov. 18, 2005 at 647.]  The jury was also fully

22 instructed on murder and its degrees, the various forms of manslaughter, and the effect

23 of voluntary drug intoxication on the various mental states and the intents for the

24 charged crimes and lesser offenses. [Lodgment No. 2, RAT Vol. 8 Nov. 16, Nov. 17 &

25 Nov.18 at 640-52.]  The jury declined to convict Petitioner of involuntary manslaughter,

26 thus rejecting the theory that Petitioner was unconscious from drug use.  The jury also

27 rejected unconsciousness as a defense in reaching guilty verdicts on the charges of

28 attempted voluntary manslaughter and second degree murder, both of which required

1  specific intent findings.  These findings support the conclusion an unconsciousness

2  instruction would not have influenced the jury's verdict.

3         Based on the foregoing, the Court concludes there is no indication the trial court

4  erred in not *sua sponte* instructing the jury with CALJIC 4.30.  Even it there was an

5  error, it was harmless and did not substantially and injuriously affect or influence the

6  jury's verdict.  The state courts' denial of Petitioner's claim was not contrary to, or an

7  unreasonable application of clearly established U.S. Supreme Court precedent and,

8  therefore, the Court recommends this claim be denied.

9         **C**. **Claim 5: Insufficient Evidence to show Implied Malice**

10         Petitioner also claims there was insufficient evidence to support the jury's finding

11  of implied malice to support the second degree murder conviction.  He claims the

12  evidence of implied malice was insufficient because it did not establish Petitioner "was

13  subjectively aware smoking PCP would result in a homicidal reaction."  [Doc. No. 1 at

14  13 (*citing* Ex. F at 68, 73.)]

15                      1.   Court of Appeal's Ruling

16  The Court of Appeal rejected this argument stating:

17         With regard to his second degree murder conviction, [Petitioner's]
       only assertion is that there was insufficient evidence of implied malice to
18       support such verdict based upon his voluntary ingestion of PCP, which
       caused him to suffer a drug-induced psychosis that prevented him from
19       subjectively appreciating the risks involved in his conduct.  However, as
       already discussed in the previous section, there was no substantial
20       evidence to show Miller actually had suffered a drug-induced psychotic
       episode.  Rather the evidence revealed an intention on Miller's part to
21       unlawfully kill his victim.  From that facts that Miller obtained a loaded gun
       from the truck (sic) of his car before putting on a glove and walking up
22       some stairs where he pointed the gun at the back of his victim's head
       before shooting him in the back of the neck and again shooting the victim
23       several more times in his torso and arm after falling forward on the
       ground, a jury could reasonably infer an intent to kill the victim sufficient to
24       support express malice.   Miller's intentional acts after the shooting, of
       running away, disposing of the gun and glove, hiding from authorities and
25       then placing the blame on others, provides additional support for such a
       finding. (*See Lasko, supra* 23 Cal.4th at p. 107; *People v. Lashley* (1991)
26       1 Cal.App.4th 938, 945.)

27         Contrary to Miller's premise that the jury had to have relied on
       implied malice for his second degree conviction because it had also found
28       him guilty of attempted voluntary manslaughter and thus necessarily
       rejected an intent to kill theory, a second degree murder conviction based

08cv1675

on a finding of express malice, without premeditation, is fully consistent with an attempted voluntary manslaughter conviction founded on intent to kill.  Because the jury was not asked to identify on which theory either conviction was based, the second degree murder conviction may have been found on either express or implied malice.

Moreover, even without the intent to kill, the jury had before it abundant evidence about the manner of the killing, including the use of the firearm and the lack of provocation by the victim, from which it could reasonably find implied malice to support its verdict. As already noted, the trial court properly instructed the jury on the various degrees of murder and manslaughter, including their various mental states and intents, and on Miller's defense of voluntary intoxication.  The jury rejected Miller's theory that the shooting was committed while he was unconscious due to voluntary intoxication caused by PCP ingestion. The jury was not required to believe that such intoxication prevented him from appreciating the risk posed by his intentional conduct and could have easily rejected such a theory based on the totality of the evidence. In sum, ample evidence supported the jury's finding that Miller acted with express or implied malice.

[Lodgment No. 3, Cal. Ct. App. slip. op. at 25-28.]

### 2.    Petitioner alleges a federal question

Respondent argues Petitioner cites only state law to support this claim and fails to allege a violation of due process.  [Doc No. 15-1 at 13.]  He argues Petitioner's claim is merely an error of state law and, therefore, does not constitute a federal question.  *Id.* Petitioner, however, specifically cites to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the seminal case that sets forth the test federal courts use to determine sufficiency of the evidence in the context of a petition for habeas corpus.  [Doc No. 1, at 13 (*citing* Exhibit F at 105)]; *See e.g., Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); s*ee also Ellis v. Armenakis*, 222 F.3d 627, 630 (9th Cir. 2000) (*citing Jackson v. Virginia* 443 U.S. 307, 319 (1979)); *Juan H.*, 408 F.3d at 1274 (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Thus, the Court concludes Petitioner's last claim states a federal question and analyzes the claim accordingly.  *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

### 3.    Clearly Established Federal Law

The Fourteenth Amendment's Due Process Clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of

08cv1675

guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  A

claim of insufficiency of evidence fails if, "after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt."  *Davis,* 384 F.3d at 639 (*quoting*

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); s*ee also, Ellis*, 222 F.3d at 630 (*citing*

*Jackson v. Virginia* 443 U.S. 307, 319 (1979)); *Juan H.*, 408 F.3d at 1274 (*quoting*

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  A "cour[t] faced with a record of

historical facts that supports conflicting inferences must presume-even if it does not

affirmatively appear in the record-that the trier of fact resolved any such conflicts in

favor of the prosecution and must defer to that resolution." *Davis*, 384 F.3d at 639.  The

Ninth Circuit has stated that a petitioner arguing insufficiency of the evidence has "a

heavy burden," and cases "a considerable hurdle."  *Davis,* 382 F.3d at 639; *Juan H.,*

408 F.3d at 1274.  In deciding whether a due process violation has occurred, this Court

must look to "the substantive elements of the criminal offense as defined by state law."

*Jackson*, 443 U.S. at 324, n. 16.

  In reviewing Petitioner's claim, the Court of Appeal observed, "[t]he test is not

whether the evidence proves guilt beyond a reasonable doubt, but whether substantial

evidence, of credible and solid value supports the jury's conclusion."  [Lodgment No. 3,

Cal. Ct. App. slip. op. at 25] (internal citation omitted).  The court considered, "whether

*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  [*Id.*] (internal citations and quotation marks omitted) (emphasis in

original.)

  Petitioner's claim is predicated on the argument the evidence was insufficient to

establish implied malice to support the second degree murder conviction.  As the Court

of Appeal noted, the jury may have reached its verdict on either express or implied

malice theories.  The Court, therefore, will evaluate the sufficiency of the evidence

under both theories.  Under California law, "[m]urder is the unlawful killing of a human

being...with malice aforethought."  *People v. Ramirez*, 39 Cal.4th 398, 464 (2006)

1   (*quoting* Cal. Penal Code § 187(a)). Malice may be express or implied.  *Id.*  Express

2   malice occurs when the defendant "manifest[s] a deliberate intention unlawfully to take

3   away the life of a fellow creature."  *Id.* (*quoting* Cal. Penal Code § 188)).   Malice is

4   implied "when no considerable provocation appears, or when the circumstances

5   attending the killing show an abandoned and malignant heart."  *Id.*  Murder that is

6   committed with malice but is not premeditated is of the second degree.  *Id.* (*citing* Cal.

7   Penal Code § 189.)

8          As the Court of Appeal noted, the evidence showed Petitioner obtained a loaded

9   gun from his car and put on a glove before shooting the victim in the back of the neck

10   and again three more times in his lower back, arms and chest. [Lodgment No. 3, Cal.

11   Ct. App. slip. op. at 3.]  These facts alone support a finding of express malice.  *See*,

12   *e.g.*, *Ramirez,* 39 Cal.4th at 464 (two shots fired at close range without provocation

13   supported a finding of express malice); *People v. Smith*, 37 Cal.4th 733 (2005) (firing a

14   gun at close range in manner that could inflict a mortal wound supports an inference of

15   intent to kill and express malice); *People v. Bolden*, 29 Cal.4th 515, 560-561 (2002)

16   (stabbing a victim in the back when the victim was "apparently unsuspecting and

17   defenseless" is "evidence of intent to kill" that is so "overwhelming" an error in jury

18   instructions was harmless.)  Evidence indicating the intentional shooting of a victim

19   "twice at close range without provocation and...with an abandoned and malignant heart"

20   is "easily sufficient" to establish implied malice for second degree murder.  *Ramirez*, 39

21   Cal.4th at 464-65.  Thus, the evidence in this case, which shows Petitioner shot the

22   victim multiple times at close range, is sufficient to establish implied malice for second

23   degree murder.  [Lodgment No. 2, RAT Vol., Nov. 10, 2005 at 388, 390, 404.]

24          Furthermore, as articulated in the earlier discussion of Petitioner's jury instruction

25   claims, evidence of Petitioner's voluntary ingestion of the PCP and the effects thereof

26   were considered by the jury.  The jury was free to reject this evidence, as it apparently

27   did.

28   / /

Based on the foregoing, the Court concurs with the Court of Appeal's conclusion a rational trier of fact could have found beyond a reasonable doubt proof of malice and guilt on the charge of second degree murder.  The state courts' denial of Petitioner's claim was not contrary to, or an unreasonable application of clearly established U.S. Supreme Court precedent and, therefore, the Court recommends this claim be denied.

## V.    RECOMMENDATION

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to habeas relief under the applicable legal standards.  Therefore, the undersigned magistrate judge hereby recommends the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Janis L. Sammartino, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that not later than **March 19, 2010**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed no later than **April 1, 2010.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 148 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  February 22, 2010

Jan M. Adler
U.S. Magistrate Judge

08cv1675